The case was heard anew at this term, and judgment given as follows:-
Porter, J.
On the 14th day of December, 1819, a contract of marriage was entered into between the plaintiff in this cause, and the daughter of the defendant; by this contract, three slaves, estimated at the sum of $2650, were given by the father in dowry, and transferred to Mitchel at that price.
On the 20th of January, 1820, the marriage took place, and on the 13th of April following, this suit was commenced, alleging that the said slaves were affected with redhibitory vices; that it was known to the defendant they were so at the time he alienated them ; and that they were given with a view of cheating and defrauding the plaintiff. The peti *652 tion concludes with a prayer, that the transfer of the three slaves be annulled and set aside, and that the defendant pay the sum of $3500.
The answer denies these allegations, and the plaintiff’s right to sue. The cause was submitted to a jury. There was judgment for the defendant and the plaintiff appealed.
This cause has been already heard here, and it appearing to the court on the view which they then took of the subject, that the record was defective, the appeal was dismissed. A rehearing has been granted and the whole case is again submitted to us.
As to the correctness of the principles contained in the opinion then delivered, I do not entertain a doubt. I still think, that if a witness has been sworn and examined on the trial, his testimony ought to be sent up. That if the parties by consent have waved this, that consent should appear on the record, or make a part of the statement of facts,made out according to law; and that the judge cannot, after judgment is signed below, either make out this evidence, or furnish the reasons why it was not taken down. As it is unnecessary to go again into the subject, I refer to the opinion already delivered, as conveying *653 fully my ideas on the point there examined and decided on.
But, on further consideration, a doubt was excited in the mind of the court, if this case came within the ride there laid down. And the difficulty felt, and the reason for granting a rehearing was, whether enough did not appear on the record to shew that the parties consented to wave the testimony.
The trial was had on the 26th of May; on that day the judge made out, and on the next, filed a statement of the evidence, with the following certificate: "I certify the foregoing facts as all the evidence taken in court, on the trial of this cause.” 27th, the following consent was put on record: “ The parties in this cause agree that the judge certify the record as containing the facts in the case.”— When the cause was formerly decided, I thought that these expressions amounted to nothing more than an agreement, that the judge should certify the proceedings instead of the clerk, as the latter is one of the parties to this suit. But more mature reflection has convinced me that sufficient weight was not given to this consent, and that as the oral testimony taken down by the judge, and dec *654 lared by him to contain it all, made a part of the record at the time the parties came to this agreement; the admission that he should certify the record, as containing the facts, must be considered to relate to that statement, and is a confession that it was a correct one.
This objection removed, we now come to the merits of the case; they depend on the extent and weight of the evidence taken on the trial, to establish the existence of redhibitory defects in the slaves already mentioned.
The substance of the testimony, is as follows :—
In relation to the negro Tom. Rickenberger swears, that the defendant bought him in Charleston, that the witness refused to buy him, that the vendor sold him for every thing that was bad, and addicted to every vice; and that he was purchased out of a place called the sugar house, where run-away and bad negroes are confined. He further testifies, that Jewel knew the slave was addicted to robbery.
Gould, another witness, proves, that he heard Jewel say that this slave was addicted to robbery. The defendant, to meet this, relies, *655 first,—on the testimony of the last witness. who was his clerk, familiar with his affairs, and intimate in his family; and who swears, that the reason he had for believing Tom a robber, was because the family stated he had stolen fowls, and had been concerned in the theft of a sheep belonging to his master, Jewel; and that he knows of no other instance of the slave having committed robbery.
Secondly,—On the evidence of Tournois. one of the appraisers, that for several causes, such as stealing, he has put negroes in irons, and that he would give $2000 for slaves he has seen ironed.
Now, great as my disposition is to respect the verdict of a jury, in matters of fact, and in case of doubt, to yield up my conclusions to theirs; yet, so long as the law gives a legal right to parties in a suit, to demand the opinion of this court, on cases tried in this way, they must obtain it. And if the evidence produces an entirely different conviction on our minds, from that which it has done on those of the jury, we must of necessity so pronounce it.
The evidence just detailed is of that kind. It makes out, I think, clearly, and beyond dis *656 pute, the vice complained of. The declaration of Rickenberger, that the person from whom the defendant purchased this slave, sold him as one of the worst character; and the testimony of Gould, another witness, that Jewel acknowleged the negro was addicted to robbery, is as strong proof as any case of this description could well furnish; taken with the other facts detailed, it is insurmountable ; and is in no respect, weakened by the declaration of the witness, detailing the particular facts, related by the family, as a ground for his own belief. If there had not been more within the knowlege of the first vendor, and the present defendant, they would not have made the declarations which it has been proved, proceeded from them.
As to the negro Jack, the following evidence was given — Gould, the witness already mentioned, knows that the slave was in irons for having runaway: when the appraisers under the marriage contract, came to estimate him, they were taken off; when they went away he was again ironed. It is within the witness's knowlege that the defendant knew the slave had run-away.
O’Neil, the overseer of Jewel, proved that *657 the negro was put in irons one mouth after he arrived from Charleston: he was treated so for having absented himself from work for a few days. From that time, until the estimation already spoken of, these irons were not taken of.
Several witnesses established, that the three negroes mentioned in the marriage contract, have run-away frequently since they came into the possession of the plaintiff.
This evidence is rebutted by the following proof:—
Gould declares, he never know this slave to run-away more than once. O’Neil says, that he was put in irons for absenting himself, but does not think he was off the plantation. It was principally on account of his sore eyes, and that he was too much pushed, that he ran-away. That he considered the negro too sick to work. When he found him he had his basket and about 20lbs. of cotton. Does not consider him addicted to run-away, but an idle fellow. He never run-away but once. The chain put on him was an iron plow-trace, and he could go, and did go, on any part of the plantation.
The credit of this last witness has been *658 assailed, but, in my opinion, unsuccessfully. He was proved on the trial to be an honest, correct man; and the jury has sanctioned that opinion by their verdict.
I cannot, from this testimony, gather, that this slave ever ran-away but once antecedently to the time he came into Mitchel’s possession. Indeed, it is not distinctly proved that he was off the plantation; and the overseer assigns as a cause for absence, sore eyes, and being too hard pushed. This, I think, is not sufficient to establish a habit of running away; it is proving but one act of absence, and accounting for it. In the case of André vs. Foy, to which our attention has been directed, the negro Boucaud, had been committed to jail once as a run-away, and ran-away twice within a few days after the purchase. The court there held, that these facts, when connected with each other, raised a presumption that the habit existed anterior to the sale. Here, however, there is not any fact of sufficient importance to couple with the subsequent elopement after the slave came into the plaintaiff's hands. Another feature of that case was, that a jury had fortified the presumption otherwise flowing from the evidence, by *659 their verdict. Here they have negatived it, and I do not feel myself authorised to disturb their finding.
In relation to those facts, which, though not proof in themselves of the vice, it is insisted, go far in support of the other evidence. I would remark, that very little can be infered from the slave being in irons. They are often placed on as a punishment; and in this case, they were not of that description which would have prevented him from absconding, if he had wished to leave his work a second time.
The circumstance of all the slaves leaving Mitchel after he had got them, though only one is charged with having the habit of a run-away before, does not give much additional weight, in my mind, to the claim of the plaintiff. This habit must be proved to exist at the time of the sale. Subsequent acts, to be sure, furnish some clue to ascertain previous habits, but they are not very strong proof, and for an obvious reason, such testimony should be received with great caution. For without being understood to make the remark, in relation to the present defendant, it is clear, that if much importance is attach *660 ed, in general, to such proof, any purchaser dissatisfied with his acquisition, may, by his treatment to the slaves bought, force them to run off, and thus, by his own act, make evidence for himself.
It is possible I may be mistaken in this view of the subject, and that the evidence is entitled to more weight in establishing a redhibitory vice in this slave, than after a most attentive consideration, I have been able to give it. But of one thing I am very certain, it does not so preponderate in favour of the appellant, as, in my opinion, to justify this court in reversing the decision which a jury has pronounced on it.
In regard to the wench Jenny, I deem it sufficient to remark, that I cannot discover, from any thing appearing on the record, that she was affected with a redhibitory vice or defect at the time of the transfer.
Evidence was taken to shew that these were the worst slaves the father-in-law owned; that he stated nothing to the estimators respecting their character; that if the fact of Jack being in irons, had been communicated, he would not have been esteemed at so high a price.
*661 On the other hand, proof was adduced ¡.hat Mitchel knew the character of the slaves perfectly well, that he had seen Jack in irons, that he was present at the estimation, that he made no objection to it, and remained silent as to their defects.
All this has little to do with the case, which is confined to the enquiry, whether or not there existed redhibitory vices in this property at the time of the transfer ? I think these defects have been proved to exist in the negro Tom, and not in the others; and I have gone more into detail in the case, than is usual, because I do not know that this opinion will be that of the court.
On the whole, the judgment of the district court should be annulled, avoided and reversed, and this court proceeding to give such decree as the district court should have rendered, ought, in my opinion, to order, adjudge and decree, that the transfer of the negro Tom, to the plaintiff made by the act of marriage contract between the appellant and his wife, on the 14th of December, 1819, be annulled; that the plaintiff do recover of the defendant, eight hundred and fifty dollars, with costs of suit in this court and the court *662 below; to be paid by defendant on the delivery or tender of said slave, free from any incumbrance, mortgage, or privilege (other than the marriage contract) created on said slave by said Mitchel. And if on the tender or delivery of said slave, accompanied by a certificate from the register of mortgages of this city, and the parish judge of the parish where the plaintiff resides, that the said slave is free from incumbrance, mortgage or privilege, other than the marriage contract, the said Jewel shall fail to pay over to the said Mitchel the sum of money aforesaid, that then execution do issue from the court a quo against the said defendant, for the sum of eight hundred and fifty dollars, the costs incurred by this appeal and those in the district court.
Martin, J.
I find no difficulty in concurring with any part of the opinion just pronounced, except that which refers to the negro Jack. The case of Macarty vs. Bagneres, appeared to be so similar, that I at first thought the same decision ought to take place here; but on close examination, I perceive a considerable difference.
The slave sold to Macarty was shewn to *663 have run-away once before the sale, and did run-away immediately after. But in the present case Jack did not run-away with the intention of escaping from his master; but lurked about for some days on the skirts of the plantation, to avoid working. His being put in irons, is presented to us, on the one side, as a measure deemed essential to prevent an escape; on the other, as a common domestic, punishment. Bagneres kept his negro five months in jail, till the very moment of delivery, after the sale. So long a detention, and the consequent loss of his services, in the meanwhile, manifested the master’s consciousness that the slave would escape as soon as the opportunity offered.
Notwithstanding all this, the circumstance of the irons being only knocked off when the appraisers arrived, and instantly replaced on their return, manifests perhaps an intention of placing him before them in a more favourable view than candour allowed ; but the case comes up fortified, by the finding of the jury in favour of the defendant. This turns the scales against the plaintiff. I conclude that he ought to be relieved in respect of the negro Tom, only.
*664 Mathews, J.
I have attentively examined the opinion of the junior judge of the court; and am sorry to be compelled, by my view of the case, to dissent from the conclusion therein expressed, as to the effect of the consent of the parties, in relation to the manner in which the judge of the court a quo should certify the record as containing all the facts in the cause. I am still of opinion, that by this consent, nothing more was intended than to substitute the certificate of the judge for that of the clerk, who was a party to the suit, and from that circumstance, ought not, in pursuance of common prudence, as exercised in the affairs of men, to have been allowed to make out and certify the record, without special attention either by the opposite party or by the judge. In ordinary cases, it is the duty of the clerk of the Court to certify all matters which may be recorded in the trial of any cause.
According to the act of 1817, the testimony of witnesses must be reduced to writing by the clerk, becomes a part of the record, and is to be sent up to the supreme court, to serve as a statement of facts, whenever required by either of the parties litigant. This law is in *665 tended to give to suitors a choice as to the manner in which the facts of a cause shall be brought before the appellate court, either in brought before the appellate court, either in pursuance of the mode therein prescribed, or in conformity with the provisions of the act of 1813. I am ready to admit that the parties to a suit, may, by consent, wave the necessity of transmitting the whole testimony as taken down in a cause, and substitute in its place, a statement of facts as required by the former law; but their intention ought to be most clear and manifest by the expressions of such consent, before depriving them of the benefits arising from an examination of the whole testimony in both courts. In the present case, the consent of parties, that the judge should certify the record, as containing all facts in the case, does not, in my opinion, amount to an agreement to take the judge’s statement as a substitute for the evidence, which it seems was required to be taken down in writing. It has been decided by this court, that in all cases, wherein the testimony is reduced to writing, and sent up on the record, we would presume that it had all been taken down and regularly sent up, until the contrary should be shewn : but it is here shewn, that a witness was sworn and *666 examined, and his testimony does not appear, nor does any consent appear on the record, by which the parties have waved the necessity of reducing it to writing, and handing it to this court. This view of the subject leaves the reasoning of the court in our former judgment, in its full strength and vigour, which was then, and still is, satisfactory to my mind.— I therefore conclude, that the first judgment ought not to be disturbed, unless the justice of the case require that the case should be remanded.
Mitchel in propriâ personâ, Livingston and Carleton for the defendant.
It has been the uniform practice of this court, in all cases, when the facts were not brought fully before it (as required by law) either to dismiss the appeal, or to remand the cause for a new trial. The latter course of proceeding has always been pursued, when it was believed that the justice of the case, as exhibited by the record, would authorise it; but I do not think that the present belongs to that class of cases.